UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALFASIGMA USA, INC.

    Plaintiff,

v.

WESTMINSTER PHARMACEUTICALS, LLC

    Defendant.

Case No.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**INJUNCTIVE RELIEF SOUGHT**

## COMPLAINT

Plaintiff Alfasigma USA, Inc. ("Alfasigma") (formerly known as Nestlé Health Science-Pamlab Inc.) brings this Complaint against Defendant Westminster Pharmaceuticals, LLC ("Defendant") and in support thereof, alleges as follows:

### I.   INTRODUCTION

1. This is an action against Defendant for tortious interference with a settlement contract. In the August 26, 2014 Master Settlement Agreement and Mutual Release ("the Agreement"), Plaintiff settled a false advertising and unfair competition case it had filed against Virtus Pharmaceuticals, Inc. ("Virtus"), captioned *Nestlé Health Science-Pamlab, et al. v. Virtus Pharmaceuticals, LLC*,

1

Docket No. 9:12-cv-81202 (S.D. Fla.) (the "*Virtus* Litigation"). Mr. Louis Sanchez, the then-chief executive officer of Virtus, and Mr. Ryan Menendez, at that time Virtus's Vice President, received significant benefits under the Agreement, and were bound by it. Messrs. Sanchez and Menendez subsequently joined Defendant Westminster. As he did with Virtus, Mr. Sanchez currently serves as Defendant's Chief Executive Officer, while Mr. Menendez served as Defendant's Senior Vice President of Business Development.

2. Under the Agreement, Messrs. Sanchez and Menendez were released of all claims against them personally and, in exchange, agreed to refrain, until the end of 2024, from assisting *any* third parties from manufacturing, marketing, or offering for sale certain medical food products. Defendant, however, with knowledge of the Agreement and Messrs. Sanchez's and Menendez's duty to not provide assistance in launching the covered medical food products, induced them to breach the Agreement. With Messrs. Sanchez's and Menendez's assistance, Defendant launched competing medical food products, to Plaintiff's ongoing injury.

3. By inducing Messrs. Sanchez and Menendez to breach the Agreement, Defendant has intentionally and willfully interfered with Plaintiff's contractual rights, and in so doing caused significant, ongoing, and irreparable injury to Plaintiff. Alfasigma brings this suit to stop Defendant's ongoing interference with its

contractual rights, and to obtain compensatory and punitive damages for Defendant's willful and intentional misconduct.

## II. PARTIES

4. Plaintiff Alfasigma USA, Inc., formerly known as Nestlé Health Science Pamlab, Inc., is a Delaware corporation with its principal place of business at 4099 Highway 190 East Service Road, Covington, Louisiana 70433. A fully integrated pharmaceutical company founded over fifty years ago, Alfasigma specializes in the development, manufacture, sale, and distribution of medical foods throughout the United States.

5. Defendant Westminster Pharmaceuticals, LLC is a pharmaceutical company which claims to distribute "generic drugs to pharmacies, hospitals, and trusted wholesalers and distributors across the country." A limited liability company, Defendant is organized under Delaware law, and has offices in Tennessee and Tampa, Florida. Based on Defendant's public filings, it has three members: Gajan Mahendiran, Amuda Mahendiran, and Vijay Patel.

6. Defendant may be served with process through its Florida Registered Agent, Corporation Service Company, 1201 Hays St., Tallahassee, Florida 32301.

### III.   JURISDICTION AND VENUE

7. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

8. For purposes of diversity jurisdiction, Alfasigma is a citizen of Delaware and Louisiana.

9. As a limited liability corporation, Defendant shares the citizenship of its members. On April 6, 2021, Defendant filed its 2021 Foreign Limited Liability Company Annual Report with the Florida Secretary of State, representing that the address of all three of its members is 1321 Murfreesboro Pike, Suite 607, Nashville, Tennessee 37217. In addition, in a document filed on September 24, 2020, in the case captioned *Jain et al. v. Nexgen Memantine, Inc. et al.*, Case No.: 8:20-cv-02263-VMC-JSS, (M.D. Fla. Sept. 24, 2020), Dkt. 34, Mr. Gahan Mahendiran represented that he is a resident of Virginia. Accordingly, and based on this publicly-filed information, Defendant is a citizen of Tennessee and Virginia. Accordingly, there is complete diversity between the parties.

10. The exercise of personal jurisdiction over Defendant in Florida is proper as acts giving rise to Plaintiff's cause of action have occurred in the state of Florida. In addition, Defendant is registered as a Foreign Limited Liability Company

in Florida, and maintains corporate headquarters in Florida at 3450 Buschwood Park Drive, Suite 110, Tampa, Florida 33618.

11. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claim of tortious interference alleged herein occurred in this District.

## IV. FACTUAL BACKGROUND

### A. Plaintiff's Medical Foods

12. Alfasigma specializes in the development of high quality medical foods—defined by federal law as foods that are "formulated to be consumed or administered enterally under the supervision of a physician and which [are] intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation." 21 U.S.C. § 360ee(b)(3).

13. Alfasigma markets and sells its medical foods throughout the United States. Alfasigma's products include Deplin®, formulated to address the distinctive nutritional requirements of patients with depression or schizophrenia, and Metanx®, formulated to address the distinctive nutritional requirements of patients with diabetic peripheral neuropathy. Both Deplin® and Metanx® are formulated with a stable, pure, and crystalline form of L-methylfolate Calcium—the biologically active form of folate, which is critical for human health. Deplin® is formulated in

5

two strengths, with 15 mg of L-methylfolate Calcium and 7.5 mg of L-methylfolate Calcium. Metanx® is formulated with 3 mg of L-methylfolate Calcium, 35 mg of Pyridoxal-5´-Phosphate, and 2 mg of Methylcobalamin.

14. In addition to marketing and selling its own brand-name medical foods, Alfasigma also supplies medical foods to a joint venture, which offers *authorized generic* versions of the original tablet forms of Deplin® and Metanx®, marketed under the names L-Methylfolate and Foltanx™ (the "Authorized Generics"). The Authorized Generics are sold throughout the United States.

15. A "generic" is a pharmaceutical product that is both *pharmaceutically equivalent* to the brand name product—that is, formulated with the same active ingredients, in the same amounts, and with the same dosage form—and *therapeutically equivalent*—that is, has been shown to be bioequivalent to the brand name product such that it will have the same clinical effect and safety profile when administered to patients under the conditions specified in the label. The Authorized Generics—manufactured using the same ingredients and in the same facility as Deplin® and Metanx®—meet this demanding standard.

16. Medical foods, including Deplin®, Metanx®, and the Authorized Generics, are often provided to patients through prescriptions written by their doctors and filled at a pharmacy. Generally, pharmacists presented with a prescription for a pharmaceutical product will consult a pharmaceutical information

6

database to determine if there is a generally less-expensive generic available for dispensing. If there is, the generic will be substituted in place of the brand name product actually prescribed. Unlike prescription drugs, however, the FDA does not make equivalency determinations regarding medical foods. Thus, the pharmaceutical database providers make the decision whether to assign the same database code—and thus "link" for substitution a generic product to a brand name product—based on information provided by the companies that are marketing the products.

**B.  Plaintiff's Lawsuit and Settlement with Virtus**

17.  On October 29, 2012, Plaintiff brought suit against Virtus in Case No. 9:12-cv-81202, in the United States District Court for the Southern District of Florida (the "*Virtus* Litigation"). The *Virtus* Litigation asserted claims of false advertising and unfair competition in connection with Virtus's marketing of unauthorized, purportedly generic versions of Deplin® and Metanx® (among other products).

18.  In the *Virtus* Litigation, Plaintiff alleged that the products Virtus was advertising and selling as "generic" versions of Deplin® and Metanx® were in fact inequivalent and substandard, but nevertheless had been linked to Deplin®, Metanx®, and the Authorized Generics in pharmaceutical information databases. The Plaintiff further alleged that the advertising and sale of inequivalent products

injured Plaintiff both in terms of sales and reputation. Notably, even in its own motion practice, Virtus acknowledged that Messrs. Sanchez and Menendez had admitted during trial that Virtus had not tested its products for stability. Case No. 9:12-cv-81202, Dkt. 352.

19. The jury's questions during their deliberations indicated they likely would have returned a plaintiff's verdict. For example, a jury note to the Court during deliberations concerned the definition of "detriment"—an element of one of Plaintiff's claims—and whether it was "considered a detriment if a consumer was mislead [sic] to purchase a product when the product was not what the consumer intended to buy?" Case No. 9:12-cv-81202, Dkt. 387 (Tr. Proceeding Aug. 26, 2014), at 4:4-6.

20. Virtus agreed to settle the litigation while the jury deliberated, resulting in the Agreement. *See* Case No. 9:12-cv-81202, at Dkt. 363 (Aug. 26, 2014) ("Parties announced settlement prior to verdict.") One of Plaintiff's objectives in resolving the *Virtus* Litigation was to prevent the advertising and sale of inequivalent products as "generic" versions of Deplin® and Metanx®. To this end, the Agreement provided that, until the end of 2024, the "Virtus Parties"—which includes Messrs. Sanchez and Menendez—would not "assist or attempt to assist" any "Third Parties" in "engag[ing] in any manufacture, use, sale, offers for sale, importation, distribution, advertising, promotion, or marketing of any such Third Party's product

given the same Database Code by pharmaceutical databases as any" of the products covered by the Agreement, including the "Tablet Product."

21. "Tablet product" is defined in the Agreement by reference to the database codes for the Authorized Generics of Deplin® and Metanx®.

**C. Defendant's Chief Executive Officer and Senior Vice President of Business Development Are Bound by the Agreement**

22. Mr. Sanchez, Virtus's Chief Executive Officer during the *Virtus* Litigation and at the time of the negotiation and execution of the Agreement, executed the Agreement:

> IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.
>
> Virtus Pharmaceuticals, LLC
>
> By: *Luis Sanchez*
> Title: CEO

23. Along with Mr. Sanchez, the Agreement designated Mr. Menendez, then serving as Virtus's Vice President, as the persons to receive notices for Virtus under the Agreement:

9

> (j) <u>Notices</u>. Any notice required or permitted by this Agreement shall be in writing and served either (i) by hand delivery or (ii) by facsimile and United States mail, first-class, postage prepaid, and addressed to the facsimile and address set forth below:
>
> <u>Notices to Virtus Parties:</u>
>
> Virtus Pharmaceuticals, LLC
> 2649 Causeway Center Drive
> Tampa, Florida 33619
> Attention: Louis Sanchez
>     Ryan Menendez
> Phone: (813) 283-1344
> Fax: (813) 283-1354

24. The Agreement provided significant consideration to both Messrs. Sanchez and Menendez, including releasing them personally from all claims by Plaintiff. In exchange, Messrs. Sanchez and Menendez were bound by the Agreement as among the "Virtus Parties," further defined as "Virtus and its Affiliates," which was defined to include persons, such as Virtus's Chief Executive officer and Vice President, who had "the power to direct or cause the direction of the management and policies of" Virtus.

25. In executing the Agreement, Mr. Sanchez expressly represented that he acted with actual authority to bind the Virtus Parties, specifically including himself and Mr. Menendez as Virtus's "Affiliates."

**D.    Defendant's Tortious Interference with the Agreement**

26. By 2020, Messrs. Sanchez and Menendez had both left their positions at Virtus and joined Defendant: Mr. Sanchez as Defendant's Chief Executive

Officer, and Mr. Menendez as Defendant's Senior Vice President of Business Development.

27. At the time Messrs. Sanchez and Menendez joined Defendant as officers, Defendant had constructive knowledge and, upon information and belief, actual knowledge of the Agreement binding Messrs. Sanchez and Menendez.

28. Due to their positions and roles with Virtus, Messrs. Sanchez and Menendez possess and, at the time they joined Defendant, possessed specialized knowledge regarding the development, formulation, ingredient sourcing, manufacturing, and marketing of purportedly generic versions of Deplin® and Metanx®.

29. By the Fall of 2021, Defendant had begun manufacturing, advertising, promoting, distributing, marketing, offering to sell and selling medical foods in Tablet form marketed under the names L-Methyl-B6-B12 and L-Methylfolate Calcium ("Defendant's Tablet Products"). Defendant advertises, promotes, distributes, markets, offers for sale, and sells these products as having the same ingredients and with the same strengths as the Authorized Generics. Defendant's Tablet Products share the same Database Code as the Authorized Generics and are thus "linked" for substitution.

30. Defendant aggressively advertises, promotes, distributes, markets, offers for sale, and sells Defendant's Tablet Products nationwide, including in

Florida and in this judicial district. Defendant's sale of these products have diverted sales away from the Authorized Generics, to Plaintiff's injury, and have further caused price erosion.

31. Upon information and belief, Defendant relied upon, and continues to rely upon, the assistance and direction of Messrs. Sanchez and Menendez, Defendant's Chief Executive Officer and Senior Vice President of Business Development, in manufacturing, selling, offering for sale, distributing, advertising, promoting, and/or marketing Defendant's Tablet Products.

32. Upon information and belief, Defendant did not begin manufacturing, selling, offering for sale, distributing, advertising, promoting, and/or marketing Defendant's Tablet Products until after Messrs. Sanchez and Menendez joined Defendant as its Chief Executive Officer and Senior Vice President Business Development.

33. Upon information and belief, Defendant could not have manufactured, sold, offered for sale, distributed, advertised, promoted, and/or marketed Defendant's Tablet Products without Messrs. Sanchez and Menendez assistance.

34. Messrs. Sanchez and Menendez's assistance to Defendant in its manufacture, sale, offering for sale, distribution, advertising, promotion, and/or marketing of Defendant's Tablet Product constitutes a material and ongoing breach of the Agreement.

35. Despite having constructive (and, upon information and belief, actual) knowledge of the Agreement, Defendant induced Messrs. Sanchez and Menendez to breach the Agreement to provide their specialized knowledge regarding the development, formulation, ingredient sourcing, manufacturing, and marketing obtained with Virtus in order to assist and to continue assisting Defendant in manufacturing, marketing, selling, offering for sale, distributing, advertising, promoting and marketing Defendant's Tablet Products.

36. Defendant's inducement of Messrs. Sanchez's and Menendez's breach of the Agreement was willful and/or reckless, and has continued despite notice from Plaintiff regarding the ongoing breach.

37. Defendant's interference with the Agreement, and its inducement of Messrs. Sanchez's and Menendez's breach of the Agreement have injured, and will continue to injure, Plaintiff. In addition to direct financial losses resulting from the loss of sales of the Authorized Generics, Defendant's interference also has caused irreparable harm to Plaintiff through the loss of customers and the damage to its reputation.

38. Plaintiff has retained the undersigned law firms of Carlton Fields P.A. and Shearman & Sterling LLP to pursue this matter on its behalf, and it is obligated to pay them reasonable attorneys' fees and costs and litigation expenses associated with the prosecution of this matter.

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACT

39. Plaintiff incorporates the allegations of the preceding paragraphs as though fully set forth herein.

40. A binding and enforceable contract exists between Plaintiff and Defendant's Chief Executive Officer, Louis Sanchez, and with Ryan Menendez, who served as Defendant's Vice President of Business Relations. At all times relevant herein, Defendant had constructive knowledge and, upon information and belief, actual knowledge of this binding Agreement.

41. In material breach of the Agreement, Messrs. Sanchez and Menendez assisted Defendant in its manufacture, sale, offers for sale, distribution, advertising, promotion, or marketing of Defendant's Tablet Products.

42. Defendant interfered with Plaintiff's rights under the Agreement when it induced Messrs. Sanchez and Menendez to breach the Agreement by assisting Defendant in its manufacture, sale, offers for sale, distribution, advertising, promotion, or marketing of Defendant's Tablet Products.

43. Defendant did not act with any legal justification in interfering with Plaintiff's Agreement, and Defendant was not acting under any privilege in its interference.

44. As a result of Defendants' tortious interference and the Plaintiff's Agreement, Plaintiff has suffered, and unless such acts and practices are enjoined by

this Court, will continue to suffer, irreparable injury and damage for which it is entitled to relief.

45. Plaintiff is entitled to an award of compensatory damages for Defendant's tortious interference, in an amount which exceeds $75,000. Because Defendant has acted deliberately, intentionally, and/or grossly negligently, Plaintiff also is entitled to an award of punitive damages.

## V. JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A. The Court enter a judgment and order that Defendant, its agents, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with them, be preliminarily and permanently enjoined from interfering with Plaintiff's rights under the Agreement, and specifically that until the end of 2024, Defendant will not accept the assistance of its Chief Executive Officer Louis Sanchez or Ryan Menendez, who served as its Vice President of Business Development, in its manufacture, sale, offers for sale, distribution, advertising, promotion, or marketing of Defendant's Tablet Products;

B. The Court enter a judgment and order requiring Defendant to pay Plaintiff compensatory damages in the amount of Plaintiff's actual and consequential

damages and any unjust enrichment by Defendant resulting from its tortious interference with Plaintiff's Agreement;

C. That the Court enter a judgment and order requiring Defendant to pay Plaintiff punitive damages for Defendant's deliberate, intentional, and/or grossly negligent conduct which injured Plaintiff;

D. The Court enter a judgment and order awarding Plaintiff its costs in this action, as well as awarding pre-judgment interest and post-judgment interest on any damages award;

E. The Court enter a judgment and an order awarding Plaintiff such other and further relief as the Court deems just and equitable.

Dated: March 28, 2022          Respectfully submitted,

**CARLTON FIELDS, P.A.**

/s/ J. Coy Stull
J. Coy Stull
Florida Bar No. 15864
Kai Su
Florida Bar No. 1018977
4221 W. Boy Scout Blvd., Suite 1000
Tampa, Florida 33607-5780
Tel. No.: (813) 229-4395
Fax No.: (813) 229-4133
Email: jstull@carltonfields.com
Email: ksu@carltonfields.com

-and-

**SHEARMAN & STERLING LLP**

Saul Perloff (*pro hac vice* motion forthcoming)
Lead Counsel
Andre Hanson (*pro hac vice* motion forthcoming)
Robert Rouder (*pro hac vice* motion forthcoming)
Mary Catherine Amerine (*pro hac vice* motion forthcoming)
300 W. 6th Street, 22nd Floor
Austin, Texas 78701
Tel. No.: (512) 647-1900
Email: saul.perloff@shearman.com
Email: andre.hanson@shearman.com
Email: bob.rouder@shearman.com

*Attorneys for Plaintiff Alfasigma USA, Inc.*